IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| KAITLYN M. BENNETT,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 3:25-CV-02075-JRK<br><br>JUDGE JAMES R. KNEPP, II<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

INTRODUCTION

Plaintiff Kaitlyn M. Bennett challenges the Commissioner of Social Security's decision denying her applications for disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Sept. 30, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. Bennett applied for DIB and SSI in January 2023, alleging disability beginning July 15, 2021. (Tr. 255, 257). After the claims were denied initially and on reconsideration, Ms. Bennett requested a hearing before an administrative law judge. (Tr. 101-02, 115, 127, 177). On August 22, 2024, Ms. Bennett (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 53-88). On October 18, 2024, the ALJ determined Ms. Bennett was not disabled. (Tr. 10-38). On August 1, 2025, the Appeals Council denied Ms. Bennett's request for review, making the

1

hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Ms. Bennett timely filed this action on September 30, 2025. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Ms. Bennett was 25 years old on her claimed disability date and 28 years old at the hearing. (*See* Tr. 89). She passed the general educational development (GED) tests. (Tr. 60). She previously worked as a salesclerk and fast-food worker and currently works part-time in a convenience store. (Tr. 63, 80-81).

## II.      Relevant Medical Evidence[1]

Ms. Bennett has a history of mental health impairments including unspecified depressive disorder, generalized anxiety disorder, and unspecified personality disorder. (Tr. 468-69). In December 2019, she returned to her psychiatrist Frank Stump, M.D., due to worsening depression, passive suicidal ideation, and high anxiety. (Tr. 470). Dr. Stump noted Ms. Bennett was dysphoric and constricted in affect but documented otherwise normal findings: good grooming and hygiene; good eye contact; cooperative and pleasant; logical thought processes; intact memory and recall; average intelligence; and fair insight and judgment. (Tr. 471-72). Dr. Stump prescribed Viibryd for depression and Vistaril (also called hydroxyzine), as needed, for anxiety; he also recommended Ms. Bennett seek counseling. (Tr. 473).

---

[1]      Though Ms. Bennett faces physical limitations, her arguments challenging the Commissioner's decision are primarily legal in nature and pertain to her mental limitations. She contends the ALJ found persuasive the moderate limitations from her counselor's Medical Source Statement but did not account for all those limitations in the RFC. She also contends the ALJ did not explain why she defined "superficial" as she did and did not address an alternative definition that she raised during the administrative hearing. (*See* ECF #8 at PageID 2231, 2235). I thus limit my discussion of the record to Ms. Bennett's mental limitations.

2

At her follow-up visit with Dr. Stump in January 2020, Ms. Bennett described feeling "not terrible." (Tr. 478). She still felt depressed but to a lesser degree than before. (*Id.*). Viibryd was "helpful" for the time she had it and she did not have any side effects, but she lost the medication after one week. (*Id.*). She engaged in self-harm less than two weeks before her appointment but denied suicidal or homicidal intent. (*Id.*). Ms. Bennett also reported "high social anxiety," especially at work. (*Id.*). Vistaril helped to reduce the length of her panic attacks but did not prevent or stop them. (*Id.*). Dr. Stump documented the same mental status examination findings at this visit. (Tr. 479-80). He re-prescribed Viibryd with instructions to increase the dose after one week and continued Vistaril. (Tr. 481).

In February 2020, Ms. Bennett was "less depressed" but said her memory was worsening and she felt tired. (Tr. 484, 486). She described retelling stories because she forgot she told them before and struggling to stay on-task. (Tr. 486). She was working two jobs—one on second shift, one on third shift—and sleeping just two to three hours a night. (*Id.*). Dr. Stump documented largely normal examination findings but a dysphoric mood and broad affect. (Tr. 487-88). He increased the dose of Viibryd, continued Vistaril, recommended melatonin for sleep, and ordered lab work. (Tr. 489).

By March 2020, Ms. Bennett was tired and "a little more anxious" but was still working. (Tr. 492-93). She described her memory as "iffy," and reported she can remember some things but not others. (Tr. 494). Using Vistaril daily reduced her level of anxiety to a degree and stopped her panic attacks. (Tr. 494) ("anxiety has been fair as long as she takes her meds"; "she has to take her meds every day or she will have an anxiety attack"). Her mental status examination was normal. (Tr. 495-96). Dr. Stump continued Viibryd and increased Vistaril. (Tr. 497).

In April 2020, Ms. Bennett reported her anxiety was "up and down," and she felt sad more frequently, but she was sleeping well, and her energy and motivation were "ok." (Tr. 502). Her mental status examination was normal. (Tr. 503-04). Dr. Stump continued her medications. (Tr. 505).

Ms. Bennett regularly followed up with Dr. Stump through 2020, reporting anxiety, fatigue, sadness, and a fluctuating mood throughout. (*See* Tr. 508, 517, 526, 535, 544, 553). In that time, she tried several different medications for depression and anxiety but stopped due to side effects. (Tr. 519, 528, 537, 549).

In February 2021, Ms. Bennett reported she stopped taking her antidepressant due to her pregnancy and had increased anxiety, depressed thoughts, and crying spells. (Tr. 562). At the time, she was working six-hour shifts at a convenience store. (*Id.*). Dr. Stump noted she was sad and dysphoric but documented otherwise normal findings on the mental status examination. (Tr. 564-66). Dr. Stump prescribed Trintellix for depression and continued her prescription for Vistaril. (Tr. 567).

Ms. Bennett stopped taking Trintellix due to vomiting. (Tr. 573). In March, she reported more anxiety and depression, and described crying spells as well as difficulty falling and staying asleep. (*Id.*). Her mental status examination remained the same. (Tr. 575-76). Dr. Stump prescribed Remeron due to nausea and continued Vistaril. (Tr. 578).

By April, Ms. Bennett reported her medications were helping but she had weekly severe mood swings. (Tr. 585). She was sleeping better though her medications caused her tiredness when waking. (*Id.*). Dr. Stump noted she was sad and dysphoric but documented otherwise normal findings. (Tr. 587-89).

In June, Ms. Bennett was sleeping better and feeling less tired in the morning. (Tr. 597). Dr. Stump documented a normal mental status examination and continued her medications. (Tr. 599-600, 602).

Ms. Bennett gave birth in July 2021. (*See* Tr. 608). During a follow-up appointment with Dr. Stump, Ms. Bennett reported no depression but increased anxiety because of the baby. (*Id.*). Except for anxiety (for which he prescribed Buspar), Dr. Stump recorded a normal mental status examination. (Tr. 610-13).

Buspar reduced her anxiety somewhat, but she again began feeling depressed. (Tr. 619). Dr. Stump re-prescribed Trintellix and Vistaril. (Tr. 624). By October, Ms. Bennett reported her medications were working "fine" and she was doing better. (Tr. 631).

In November, Ms. Bennett reported being off her medications for a few weeks and feeling more depressed. (Tr. 642). Dr. Stump re-prescribed Trintellix and continued her prescription for Vistaril. (Tr. 647).

The next month, Ms. Bennett reported the medication was working, but not well enough. (Tr. 653). She was leaving the house only for a once-weekly four-hour shift and medical appointments, so her anxiety was largely stable but she was otherwise isolating herself and had low energy and motivation. (*Id.*). Ms. Bennett was sad and dysphoric, but her mental status examination was otherwise normal. (Tr. 655-56). Dr. Stump increased Trintellix, continued Vistaril, and recommended she restart therapy. (Tr. 658).

The medications "d[id not] seem to work" and by her next appointment in February 2022, Ms. Bennett had been without medication for a month. (Tr. 664). She reported racing thoughts, low energy and motivation, and poor sleep. (*Id.*). Dr. Stump noted she was sad, anxious, and

dysphoric, but documented an otherwise normal mental status examination. (Tr. 666-68). He prescribed Cymbalta for depression and anxiety and continued her prescription for Vistaril. (Tr. 669).

Cymbalta helped some but also made Ms. Bennett drowsy. (Tr. 675). In March, she was sleeping better but "not great" and her depression was up and down. (*Id.*). She had good weeks during which she could leave the house, and bad weeks when she would isolate. (*Id.*). Ms. Bennett reported working one four-hour shift a week. (*Id.*). Dr. Stump recorded the same findings on mental status examination as her most recent visit (*compare* Tr. 677-79 *with* Tr. 666-68), and increased her dose of Cymbalta. (Tr. 680).

In April, Ms. Bennett reported Vistaril helped her anxiety, but her depression was "up and down still," and she had not slept well for the past week. (Tr. 746). Her mental status examination was normal. (Tr. 748-50). Dr. Stump prescribed trazadone for sleep and continued her other prescriptions. (Tr. 751).

In May, Ms. Bennett reported she still was not sleeping well, and she felt numb and sometimes experienced waves of sadness. (Tr. 759). Her mental status examination was normal. (Tr. 761-63). Dr. Stump continued her prescriptions for Vistaril and trazadone and directed her to taper off Cymbalta and start taking Lamictal. (Tr. 765).

Two weeks later, Ms. Bennett met with another clinician in Dr. Stump's practice to discuss the effect of her new Lamictal prescription. (Tr. 771). She denied side effects and reported taking a lower dose of Cymbalta rather than tapering off. (Tr. 772). She also reported taking Vistaril more often and felt overwhelmed and more irritable. (*Id.*). This was evident when Ms. Bennett became flustered and began to yell when her baby became fussy during the appointment. (*Id.*). The

6

clinician increased her dose of Cymbalta and continued prescriptions for Lamictal, Vistaril, and trazadone. (Tr. 778).

Ms. Bennett began receiving individual therapy in June 2022 (Tr. 784) and counseling in February 2023 (Tr. 1679). She spoke with her therapist and counselor regularly. (*See, e.g.,* Tr. 814, 818, 835, 854, 875, 879, 881, 897, 1680, 1686, 1194, 1656, 1671).

In July, Dr. Stump stopped Lamictal due risk of interference with another of Ms. Bennett's medications. (Tr. 802, 808). The following month, Ms. Bennett requested a higher dose of Cymbalta to address increased irritation but reported feeling stable otherwise. (Tr. 821). She was sad and dysphoric, but her mental status examination was otherwise normal. (Tr. 823-25). Dr. Stump increased Cymbalta and continued her other medications. (Tr. 827).

By September, Ms. Bennett reported sleeping poorly but otherwise "doing ok," until the last week when her medications stopped working. (Tr. 837). She had stopped taking Vistaril for anxiety. (Tr. 843). Dr. Stump increased Cymbalta and trazadone. (*Id.*).

In November, Ms. Bennett described feeling down most of the time and having no energy or motivation to do anything. (Tr. 860). She reported sitting at home and letting "everything 'pile up.'" (*Id.*). Despite increased symptoms, Ms. Bennett was "tired of taking medications" and did not want to adjust her medications. (Tr. 866). Dr. Stump continued her medications and referred her for transcranial magnetic stimulation (TMS) and ketamine therapy. (*Id.*).

In January 2023, Ms. Bennett reported she stopped taking her medications for two months because they are not as effective as she wants them to be. (Tr. 884). She experienced increased depression and suicidal ideation and restarted Cymbalta a week before her appointment. (*Id.*). Dr. Stump re-prescribed her medications. (Tr. 890).

In February, Ms. Bennett spoke with Rusheeth Thummalapally, M.D., about alternative treatments for treatment-resistant depression, including TMS, ketamine, and electroconvulsive therapy (ECT). (Tr. 704).

Ms. Bennett transferred to Certified Nurse Practitioner Sara Bailey for treatment. (Tr. 1182). In April, she reported not liking her medications and taking them inconsistently. (*Id.*). She described poor sleep, anxiety, and severe depression. (*Id.*). CNP Bailey noted Ms. Bennett was sad and dysphoric, but the mental status examination was otherwise normal. (Tr. 1185-87). CNP Bailey continued Ms. Bennett's medications. (Tr. 1189). Later that month, CNP Bailey directed Ms. Bennett to taper off Cymbalta and instead start taking Pristiq for depression. (Tr. 1196).

In May, Ms. Bennett reported Pristiq helped some. (Tr. 1243). CNP Bailey noted Ms. Bennett "appear[ed] more energetic and in better spirits." (*Id.*). CNP Bailey increased the dose of Pristiq then, and again in July. (Tr. 1249, 1658).

In January 2024, CNP Bailey continued Ms. Bennett's prescription for Pristiq and prescribed Vraylar for mood stabilization. (Tr. 1970). CNP Bailey adjusted Ms. Bennett's medications in May 2024, increasing Vraylar and decreasing Pristiq. (Tr. 2007).

III.    **Adult Function Report and Relevant Testimonial Evidence**

Ms. Bennett completed an Adult Function Report about how her mental health conditions affect her daily life. (Tr. 337-45). She explained she feels overwhelmed and often fights the urge to call off work. (Tr. 337). She struggles to focus on any one task, often finding she has started a task but left it unfinished. (*Id.*). Ms. Bennett used to work 16-hour shifts but now works 15 hours a week. (Tr. 339). When she is feeling less motivated, she puts off household tasks for another day. (Tr. 340). She can walk, drive a car, take public transportation, and go out alone. (Tr. 341). She

8

can follow instructions at her own pace but gets distracted and "mess[es] up" when she feels under pressure. (Tr. 343).

During the administrative hearing, Ms. Bennett also discussed how her conditions affect her. Relevant to her mental health, Ms. Bennett testified she works part-time running a register and stocking cups. (Tr. 62, 67). She cannot work on a full-time basis because she struggles to focus on tasks. (Tr. 66). She is typically a social butterfly but can become defiant or aggressive towards authority figures or be less friendly towards others. (*Id.*).

### STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

9

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Bennett had not engaged in substantial gainful activity since July 15, 2021—her claimed disability date. (Tr. 12). At Step Two, the ALJ identified the following severe impairments: depressive disorder; general anxiety disorder; obesity; degenerative disc changes at T5-T6, T6-T7, T11-T12, and L5-S1 with lumbar radiculopathy; and bilateral carpal tunnel syndrome/ulnar entrapment at the elbow/cubital tunnel syndrome. (Tr. 13). At Step Three, the ALJ found Ms. Bennett's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 13-19).

At Step Four, the ALJ determined Ms. Bennett's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following nonexertional limitations: She can handle (gross manipulation) and finger (fine manipulation) frequently with the bilateral hands. She can use foot control frequently. She can remember and carry out detailed instructions, use appropriate judgment and adapt to workplace changes when she is compliant with mental health medication and therapy and she can do simple routine tasks, but without production pace or quotas, for example no assembly line work. She can maintain occasional superficial contact with co-workers, supervisors, and the general public. Superficial defined as, able to be in proximity of

> others, able to exchange greetings, and able to engage in discussions that do not require persuasion or involve tandem tasks. She can adapt and manage herself in a structured, routine, and predictable work setting, where changes can be explained.

(Tr. 19). Then the ALJ concluded Ms. Bennett could not perform her past relevant work. (Tr. 29).

At Step Five, the ALJ determined Ms. Bennett could perform other work in the national economy, including as a packer, sorter, and machine operator. (Tr. 30). Thus, the ALJ concluded Ms. Bennett was not disabled. (Tr. 31).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the

11

evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters*, 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

### DISCUSSION

Ms. Bennett raises two issues for review. First, she contends the ALJ's RFC does not account for the moderate limitations in CNP Bailey's opinion. (ECF #8 PageID 2233). Second, Ms. Bennett argues the ALJ did not explain why she defined "superficial" as she did and did not

12

address an alternative definition she supplied at the administrative hearing. (*Id.* at PageID 2235). I address each argument in turn.

**I.      The RFC accounts for Ms. Bennett's moderate limitations in CNP Bailey's opinion.**

CNP Bailey completed a Medical Source Statement in checkbox format, rating the severity of Ms. Bennett's limitations in specific work-related activities on a scale from "None" (or no limitation) to "Extreme." (Tr. 2027). Social Security adjudicators use similar terminology to rate the severity of an individual's impairment in the areas of mental functioning, using the following defined terms:

- No limitation – the person can function independently, appropriately, effectively, and on a sustained basis;

- *Mild* limitation – the person's functioning independently, appropriately, effectively, and on a sustained basis is "slightly limited";

- *Moderate* limitation – the person's functioning independently, appropriately, effectively, and on a sustained basis is "fair";

- *Marked* limitation – the person's functioning independently, appropriately, effectively, and on a sustained basis is "seriously limited"; and

- *Extreme* limitation – the person is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."

Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F(2).

Diverging from the definitions provided in the regulations, the Medical Source Statement (prepared by the law firm representing Ms. Bennett) required CNP Bailey to describe the degree of impairment using a different scale:

- None = No limitations.

- Mild = Unable to function in this area less than 10% of the workday or work week.

- Moderate = Unable to function in this area from 11% to 25% of the workday or work week.

- Marked = Unable to function in this area from 26% to 50% of the workday or work week.

- Extreme = Unable to function in this area over 50% of the workday or work week.

(Tr. 2027). In her brief, Ms. Bennett emphasizes those percentage-based definitions and explains that "when Ms. Bailey opined that [she] was moderately impaired in a specific work area, Ms. Bailey was opining that she could not perform in that area adequately for 11% to 25% of the workday or week." (ECF #8 at PageID 2234). In sum, the regulatory rating scale speaks in terms of overall severity while the Medical Source Statement's rating scale reflects the frequency with which a claimant loses all ability to function.

Citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184 (July 2, 1996), Ms. Bennett says "the ALJ must explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved" and "if the ALJ's determination conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted." (ECF #8 at PageID 2234). She claims the ALJ did not address "the glaring inconsistencies between the persuasive opinions and the [RFC]." (*Id.* at PageID 2233). Without explanation, she contends the moderate limitations in CNP Bailey's opinion were not "addressed completely in the [RFC]," rendering the ALJ's conclusions "internally inconsistent and incomplete." (*Id.* at PageID 2234). Ms. Bennett does not suggest what restrictions or limitations would adequately address the RFC.

The overall thrust of Ms. Bennet's argument appears to be that because the ALJ was persuaded by CNP Bailey's opinions concerning the moderate limitations, the ALJ must adopt the Medical Source Statement's definition of "moderate limitation." It is obvious why Ms. Bennett

14

prefers the Medical Source Statement's definition of moderate limitations: the VE testified that an individual who cannot "accept instructions or respond appropriately to criticism from supervisors, complete work tasks consistently, handle regular workplace stress, and maintain emotional stability" for 11% to 25% of a workday or workweek would be precluded from competitive work. (Tr. 85). The Medical Source Statement addresses those limitations in Questions 1, 6, 17, and 15 respectively. (Tr. 2027-29). Using the Medical Source Statement definitions and the VE's testimony, any limitation more severe than "mild" would be disabling.

SSR 96-8p sets forth the SSA's policies and policy interpretations concerning the ALJ's RFC assessment. An RFC is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *2. The ALJ is solely responsible for assessing an individual's RFC and must base that assessment on all relevant evidence in the case record, including information about the individual's symptoms and any medical source statements from acceptable medical sources. *Id.*; *see also Coldiron v. Comm'r of Soc Sec.*, 391 F.App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC."). The assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence," and the ALJ must explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7.

In reviewing medical source statements, the ALJ considers the persuasive value of the opinions in terms of their consistency with other record evidence and the supportability of the opinion — *i.e.*, the evidence and explanations the medical source cites in support of the opinion.

15

20 C.F.R. §§ 404.1520c(b)(2), (c)(1)-(2); 416.920c(b)(2), (c)(1)-(2). But the ALJ need not incorporate all opined restrictions in a medical opinion, even if the ALJ finds the opinion persuasive. *Nasser v. Comm'r of Soc. Sec.*, 598 F.Supp.3d 614, 626 (E.D. Mich. Mar. 17, 2022). And if the ALJ adopts a medical source's opined limitation, the ALJ need not do so verbatim. *See Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). But, as Ms. Bennett correctly states, SSR 96-8p requires that if the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.

In this case, CNP Bailey opined Ms. Bennett is moderately limited in the following abilities:

- Accepting instructions from or responding appropriately to criticism from supervisors or superiors;

- Working in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes, or being distracted by them;

- Performing and completing work tasks in a normal workday or work week at a consistent pace;

- Carrying through instructions and complete tasks independently;

- Maintaining attention and concentration for more than brief periods of time;

- Performing at production levels expected by most employers; and

- Tolerating customary work pressures.

(Tr. 2027-29). The ALJ accepted these limitations as persuasive, finding Ms. Bennett's treatment records showed largely normal findings on mental status examinations during the relevant period such as excellent insight and judgment, intact memory and functional status, and good attention/concentration; her medications were helpful in reducing her symptoms; and the opinion was consistent with her activities of daily living. (Tr. 28-29). Notably, the ALJ did not remark on the law-firm-supplied definition or find Ms. Bennett disabled.

16

The applicable regulations contemplate that clinicians may use similar language to describe the severity of a condition, but those terms may differ in their meaning from the regulatory definitions. As the regulations explain:

> We will use all of the relevant medical and non-medical evidence in your case record to evaluate your mental disorder: the symptoms and signs of your disorder, the reported limitations in your activities, and any help or support you receive that is necessary for you to function. The medical evidence may include descriptors regarding the diagnostic stage or level of your disorder, such as "mild" or "moderate." Clinicians may use these terms to characterize your medical condition. However, these terms will not always be the same as the degree of your limitation in [an] area of mental functioning.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F(3)(a). That the ALJ did not comment on the definitions in CNP Bailey's opinion (or find Ms. Bennett disabled as those definitions would require) indicates the ALJ used the regulatory definition of "moderate," and not the law-firm-supplied definition. To the extent Ms. Bennett contends the ALJ must adopt the law-firm's severity-rating scale, neither the regulations nor caselaw require the ALJ be in lockstep with a persuasive opinion; rather the ALJ must explain any conflicts.

The ALJ adequately explained those conflicts when explaining why the ALJ adopted the moderate limitations (as defined by regulation) in the state agency psychological consultants' opinions. On initial review, the state agency psychological consultant reviewed medical records and determined Ms. Bennett was moderately limited in her ability to understand and remember detailed instructions. (Tr. 98, 111). To account for that limitation, the consultant explained Ms. Bennett can "understand, remember, and carry out simple 1-2 step instructions. More complex instructions may give her trouble especially when she is experiencing an uptick in mental health symptoms." (Tr. 98, 112). Next, the consultant found Ms. Bennett was moderately limited in the following abilities:

17

- Carrying out detailed instructions;

- Maintaining attention and concentration for extended periods of time;

- Performing activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- Sustaining an ordinary routine without special supervision;

- Working in coordination with or in proximity to others without being distracted by them;

- Making simple work-related decisions; and,

- Completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.

(Tr. 98, 112). To accommodate those limitations, the consultant determined Ms. Bennett can remember and carry out detailed instructions, use appropriate judgment, and adapt to workplace changes, but may have a harder time with more complex tasks during periods of increased symptoms. (*Id.*). The consultant also determined Ms. Bennett was moderately limited in the abilities to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*). The consultant accounted for those limitations with a restriction to superficial contact with the public, co-workers, and supervisors. (Tr. 99, 112). Last, the consultant concluded Ms. Bennett was moderately limited in the abilities to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others, and opined she could adapt and manage herself in a structured and predictable work setting where changes are

18

explained. (Tr. 99, 113). On reconsideration, another state agency psychological consultant

affirmed the findings made on initial review and added an additional restriction to preclude fast-

paced work. (Tr. 123-25, 135-37).

The ALJ found the moderate limitations in those opinions generally persuasive, explaining:

These opinions are generally persuasive because they are consistent with the claimant's treatment history. Specifically, she has had on going anxiety and depression symptoms, but medications have been effective at reducing her symptoms. For example, the clinical findings from Harbor and Anchored in Hope do not support more than moderate mental health restrictions. For example, as of October 2023, the claimant was oriented x3, her appearance, dress, behavior, and thought content were appropriate, her motor activity and perception were unremarkable, her speech was normal, her mood was euthymic with a congruent mood, her insight and judgment were excellent, her memory and functional status was intact, and her attention/concentration was good. Likewise, as of May 2024 the claimant's appearance, speech, language, attention span, concentration, thought content, thought process, associations, orientation, fund of knowledge, memory, muscle strength, gait, and station were all normal. She also denied homicidal/suicidal ideations, delusions, and hallucinations. Her medications included Pristiq, Trazodone, and Vraylar, which have been effective in reducing her mental health symptoms considering that her appearance, speech, language, attention span, concentration, thought content, thought process, associations, orientation, fund of knowledge, and memory were all normal. Furthermore, the claimant's activities of daily living, do not support any additional limitations not opined by the State Agency Psychological Consultants. For example, the claimant acknowledged that she does everything for her 2-year-old daughter, she cares for bunnies, including feeding them and cleaning them weekly, she can feed herself and can use the toilet independently, she makes meals 1-2 times per week, and she can do chores, including washing dishes, picking up toys, wiping down counters, vacuuming, and taking out the trash. The claimant further acknowledged that she goes outside daily, she can drive a car, she can use public transportation, she can go out alone, and she shops in stores for 1-2 hours per week and she purchases food, hygiene products, and diapers. Furthermore, the claimant noted that she can count change and handle a checking account, she enjoys arts, crafts, camping, and fishing, she spends time with others in person, she regularly goes to church, work, and the woman's health center, she was still working 15 hours per week, and she has no problems getting along with family, friends, neighbors, or others. Moreover, the claimant acknowledged that she can follow written instructions at her own pace, she can follow spoken instructions, she gets along with authority figures, and she has never been fired due to problems getting along with others. In sum, while reworded to be more vocationally relevant, the findings in the residual functional capacity are consistent with the opinions of the

> State Agency Psychological Consultant. Overall, the evidence supports that the claimant can remember and carry out detailed instructions, use appropriate judgement and adapt to workplace changes when she is compliant with mental health medication and therapy and she can do simple routine tasks, but without production pace or quotas, for example no assembly line work. She can maintain occasional superficial contact with co-workers, supervisors, and the general public. Superficial defined as, able to be in proximity of others, able to exchange greetings, and able to engage in discussions that do not require persuasion or involve tandem tasks. She can adapt and manage herself in a structured, routine, and predictable work setting, where changes can be explained.

(Tr. 26-27). This evaluation of the state agency consultants' opinions is adequate to show why the ALJ did not adopt more restrictive limitations or use the definition of moderate set out in the Medical Source Statement.

To the extent Ms. Bennett contends the RFC does not account for her moderate limitations, that underdeveloped argument fails. Ms. Bennett does not identify evidence establishing that a more restrictive RFC was required to adequately account for her moderate limitations, nor does she suggest what restrictions might have accounted for them. The RFC limitations are analogous to the state agency consultants' limitations, and consistent with restrictions found by other courts to accommodate moderate limitations. The ALJ properly accounted for moderate limitations in interacting with others by (i) restricting Ms. Bennett to occasional superficial interactions with co-workers, supervisors, and the public, and (ii) precluding her from working in tandem with others. *See Reeves*, 618 F.App'x at 275 (noting the ALJ accounted for the claimant's moderate limitation in social interaction by limiting him to "occasional interaction with the public"); *Bryan v. Comm'r of Soc. Sec.*, No. 2:18-cv-554, 2019 WL 2912089, at *3-4 (S.D. Ohio July 8, 2019) (affirming ALJ's decision where the claimant had moderate limitations in interacting with others and the ALJ limited the RFC to occasional interaction with others). The restrictions to simple routine tasks without production pace or quotas and occasional

and superficial contact with others that does not require working in tandem with others reasonably accounts for moderate limitations in concentration, persistence, and pace. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F.App'x 426 (6th Cir. 2014) (finding restrictions to simple, routine, repetitive tasks and avoiding contact with the general public properly account for the claimant's moderate limitations in concentration, persistence, and pace). And to account for the moderate limitation in tolerating customary work pressures, the ALJ limited Ms. Bennett to simple and routine tasks, precluded her from strict production quotas, limited the frequency and depth of her interactions with others, and restricted her to a routine and predictable work setting. *See Maldonado v. Comm'r of Soc. Sec.*, 2025 WL 1104886, at *23 (N.D. Ohio Apr. 14, 2025) (finding limitations to "simple, routine, repetitive tasks" that "do not require a specific production rate" in a "routine work setting" that does not require more than "occasional changes" account for limitations in the ability to deal with normal pressures in a work setting).

I thus decline to recommend remand on this basis.

## II.     Substantial evidence supports the ALJ's limitation to superficial interaction.

Ms. Bennett also argues the ALJ improperly invented a definition of "superficial" in limiting her interaction with coworkers, supervisors, and the public and "the ALJ did not have the authority to simply adopt a definition without explanation or discussion as to how that definition was arrived at." (ECF #8 at PageID 2236). In addition, Ms. Bennett argues "the contrary definition [she provided] and offered to the vocational witness . . . would have altered the entire outcome of the case," and the ALJ's "failure to address competing and contrary evidence constituted reversible error as it significantly prejudiced [her] claim." (ECF #8 at PageID 2236).

The state agency psychological consultants determined Ms. Bennett's mental impairments restrict her to "occasional superficial contact" with others in a work setting. (Tr. 99, 112, 124, 136). In the context of social security disability law, "occasionally" means "occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). The SSA has not defined the term "superficial." *See Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-cv-2370, 2022 WL 721455, at *17 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted*, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022). The ALJ filled that gap with "more vocationally relevant" language, defining "superficial" as "able to be in proximity of others, able to exchange greetings, and able to engage in discussions that do not require persuasion or involve tandem tasks." (Tr. 27).

About a month before the administrative hearing, Ms. Bennett's counsel submitted a letter to the SSA's Office of Hearing Operations enclosing "a copy of the Appeals Council definition of superficial interaction" and requested the letter and attachment be added as an exhibit. (Tr. 139). The attachment is a copy of the Appeals Council's remand order in an unrelated case, dated July 27, 2022, that found fault with the ALJ's rejection of the state agency psychological consultants' opined restriction to no more than "superficial interaction" with others. (Tr. 142-43). In that order, the Appeals Council explained:

> "[S]uperficial interaction" is a term that is readily defined, understood and applicable to a work setting, as it speaks to the depth, kind and quality of social interactions, and indicates that the claimant could not have sustained more than shallow or cursory interactions with others, i.e., coworkers, the general public, and/or supervisors. This term is distinguishable and distinct from "occasional" which describes the frequency of interaction with others and how much interaction the claimant could tolerate on a sustained basis.

(*Id.*). The ALJ did not address this submission at the hearing or in the written decision.

In numerous other cases, Ms. Bennett's counsel has unsuccessfully argued this definition is a new and binding SSA definition of the phrase "superficial interaction." *See, e.g., Jared W. v. Comm'r of Soc. Sec.,* No. 2:22-cv-1786, 2022 WL 17842947, at *5-6 (S.D. Ohio Dec. 22, 2022) (concluding an Appeals Council Order issued in an unrelated matter and containing that language "does not constitute broad-sweeping Agency action that is binding on the Agency at large or on this Court"), *report and recommendation adopted,* 2023 WL 1960600 (S.D. Ohio Feb. 13, 2023); *Stephen D. v. Comm'r of Soc. Sec.,* No. 1:21-cv-756, 2023 WL 4991918, at *14 (S.D. Ohio Aug. 4, 2023) ("[A] single Appeals Council order in an unrelated case is not binding on the Commissioner and has no precedential value beyond the case in which it was entered."), *report and recommendation adopted,* 734 F.Supp.3d 729 (S.D. Ohio May 16, 2024). For the same reasons, the ALJ here is not bound by the Appeals Council's definition in the other, unrelated case.

Turning to whether the ALJ's failure to explain how she arrived at the definition in the RFC or her reasoning for rejecting Ms. Bennett's proffered definition are errors requiring remand, numerous courts have rejected identical arguments. For instance, in *Betz v. Comm'r of Soc. Sec.,* No. 3:21-cv-2408, 2022 WL 17717496 (N.D. Ohio Nov. 8, 2022), *report and recommendation adopted,* 2022 WL 17985680 (N.D. Ohio Dec. 29, 2022), the ALJ defined "superficial contact" as "no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others." *Id.* at *1. Like Ms. Bennett argues here, the claimant in *Betz* asserted the ALJ erred in not explaining why he defined superficial as he did or why he rejected counsel's alternative definition. *Id.* at *10. The *Betz* Court rejected that argument, explaining in relevant part:

> The term "superficial interaction" is not defined under the Dictionary of Occupational Titles ("DOT") or Selected Characteristics of Occupations ("SCO").

23

*See Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-2370, 2022 U.S. Dist. LEXIS 43108, at *49, 2022 WL 716105 (N.D. Ohio Jan. 13, 2022). And there have been contrary findings as to whether the "plain meaning" of the term requires further definition. *See Beulah v. Comm'r of Soc. Sec.*, No. 1:20-CV-2271, 2022 U.S. Dist. LEXIS 92055, at *94, 2022 WL 1609236 (N.D. Ohio Mar. 25, 2022) (holding that the term "superficial" does not have a defined meaning for purposes of vocational testimony); *but contrast Dawn M. v. Comm'r of Soc. Sec.*, No. 3:20-CV-0258, 2022 U.S. Dist. LEXIS 102055, at *18, 2022 WL 2037804 (S.D. Ohio June 7, 2022) (holding that the term "superficial" "is a well-defined limitation in the Social Security context."). In cases in which the definition of "superficial" interaction has been in dispute, however, it has been tied to the consideration of VE testimony or a medical opinion. *See e.g., Stoodt,* 2022 U.S. Dist. LEXIS 43108 at *47-54, 2022 WL 716105 (remanding the ALJ's decision because the ALJ failed to build a logical bridge between the evidence and the ALJ's finding that the claimant was limited to "superficial" interactions when such findings were contrary to the state agency consultants' opinions); *Beulah,* 2022 U.S. Dist. LEXIS 92055, at *86-98, 2022 WL 1609236 (remanding the ALJ's decision because the ALJ failed to adequately explain her failure to include a "superficial" interaction limitation in the RFC after putting one to the VE).

\* \* \*

At its core, Betz's argument rests on the contention that the ALJ failed to adequately explain how he chose his definition of the term superficial contact, making the definition arbitrary. The ALJ, however, defined the scope of "superficial" interactions and used that definition both in posing hypothetical questions to the VE and in articulating his RFC findings. Further, none of the opinion evidence provided a conflicting definition of superficial contact. Thus, unlike other cases that have addressed an ALJ's use of the term "superficial" interactions, this case does not hinge on whether the ALJ's definition was consistent with the VE's or other opinions' articulations.

\* \* \*

The regulations provide that it is the ALJ's exclusive duty to assess the claimant's RFC. *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.,* 342 F.App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."). In doing so, he may pick and choose from the medical opinions and limitations supported by the record evidence, provided there is an explanation. *See* 20 C.F.R. § 404.1545(a); *Ferrell v. Comm'r of Soc. Sec.,* No. 1:19-CV-2289, 2020 WL 6505055 (N.D. Ohio Nov. 5, 2020). In considering these limitations and questioning the VE about them, the ALJ must put the limitation in vocational terms. *See Ferrell,* 2020 WL 6505055. From this process the ALJ defined "superficial contact" as: "no tasks involving arbitration, negotiation, confrontation, directing the

work of others, persuading others, or being responsible for the safety or welfare of others."

Looking at the decision as a whole and with common sense allows for meaningful review of the ALJ's evaluation of Betz's RFC. *See Reynolds,* 424 F.App'x at 416. Although the ALJ must connect the RFC limitations to the evidence and build a logical bridge between the two, this does not require that the ALJ provide explicit reasoning for why he defined superficial the way he did. Rather, the ALJ needed to explain why he determined that Betz was limited to superficial contact *as he defined it*, and it is sufficient that the record not be clearly contrary to that definition. *See Fleischer,* 774 F.Supp.2d at 877.

*Betz,* 2022 WL 17717496 at *10-11 (emphasis in original, internal record citation omitted). Other courts similarly upheld an ALJ's definition of superficial "so long as the limitations encompassed by those terms, as the ALJ defined them, were supported by substantial evidence." *Stocklin v. Comm'r of Soc. Sec.,* 3:23-cv-178, 2023 WL 9270479 (N.D. Ohio Dec. 13, 2023), *report and recommendation adopted,* 2024 WL 415484 (N.D. Ohio Feb. 5, 2024); *see also Paul S. v. Comm'r of Soc. Sec.,* No. 2:22-cv-4090, 2023 WL 6389428 (S.D. Ohio Oct. 2, 2023), *report and recommendation adopted,* 2023 WL 7002734 (S.D. Ohio Oct. 24, 2023).

Thus, the ALJ may define the term "superficial" so long as substantial evidence supports the ALJ's decision to incorporate the restriction into the RFC. I find the ALJ met that burden here. The ALJ determined Ms. Bennett's normal mental status examinations and varied daily activities do not support restrictions beyond those incorporated in the opinions of the state agency consultants. In support, the ALJ emphasized Ms. Bennett's reported abilities to get along with family, friends, neighbors, and authority figures; take public transportation; shop weekly for groceries; attend church regularly; and hold a part-time job working with the public. (Tr. 27). In addition, the ALJ found Ms. Bennett provides for her three-year-old child and pets and has never been fired due to problems getting along with others. (*Id.*). This evidence reasonably supports a

25

restriction to "superficial" contact with others as the ALJ defined that term. Ms. Bennett does not argue or cite evidence to show the record is clearly contrary to the ALJ's definition of the term.

Moreover, the ALJ's reasoning is sound. Ms. Bennett can be around people with whom she is familiar, like her family and friends, and can be in proximity to people she does not know, like being on a bus. She has worked in a public-facing part-time job at a convenience store for 3.5 years. (Tr. 62, 64). She is a self-described social butterfly although she can be defiant or less friendly at times. (Tr. 66). Though customers have complained when she has been less friendly, she has not been fired. (*Id.*). Finally, courts in this district have found that an RFC limiting a claimant's interaction to "no team or tandem tasks" properly accounts for a limitation to superficial interaction with others. *See, e.g., Stoodt v. Comm'r of Soc. Sec.*, No. 3:23-cv-52, 2023 WL 5337850, at *11 (N.D. Ohio Aug. 4, 2023) (collecting cases), *report and recommendation adopted*, 2023 WL 5336898 (N.D. Ohio Aug. 18, 2023). I find substantial evidence supports the limitations encompassed in the ALJ's definition of "superficial," and the ALJ's discussion of the evidence related to Ms. Bennett's mental impairments builds an accurate bridge between the evidence and the result. *See, e.g., Dieter v. Comm'r of Soc. Sec.*, No. 3:25-cv-265, 2026 WL 145346, at *15 (N.D. Ohio Jan. 20, 2026) (finding ALJ's emphasis on the claimant's improvement in symptoms with medication, ability to engage with family and friends and shop in stores, clinical findings and complaints of anxiety, and normal clinical findings at other times" built a logical bridge between the evidence and the result), *report and recommendation adopted*, 2026 WL 709730 (N.D. Ohio Mar. 13, 2026).

Ms. Bennett compares her case to *Mabry-Schlicher v. Comm'r of Soc. Sec.*, No. 24-3811, 2025 WL 1604376 (6th Cir. June 6, 2025), where the ALJ defined "superficial contact" as "retaining the

ability to receive simple instructions, ask simple questions, and receive performance appraisals but as lacking the ability to engage in more complex social interactions." *See id.* at *3. The Sixth Circuit upheld the ALJ's definition of "superficial" because "[l]acking extensive guidance, the ALJ delineated specific social restrictions based on his understanding of what a 'superficial' contact limitation requires in this context." *Id.* at *5. Ms. Bennett contends her case lends itself to a different result than *Mabry-Schlicher* because she "provided evidence of a competing definition." (ECF #8 at PageID 2237). I am not persuaded the distinction makes any difference. As discussed above, other courts have rejected the assertion of Ms. Bennett's that the Appeals Council's remand order, *i.e.,* the "competing definition," has any value beyond the case in which it was entered. *See Dallas B. v. Comm'r of Soc. Sec.,* 2:25-cv-19, 2025 WL 3710871, at *5 (S.D. Ohio Nov. 7, 2025) (collecting cases), *report and recommendation adopted,* 2025 WL 3709000 (S.D. Ohio Dec. 22, 2025).

Relatedly, although Ms. Bennett characterizes "the competing definition" as evidence the ALJ must consider in assessing her RFC, the SSA's guidance suggests otherwise. SSR 96-8p states: "The RFC is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." 1996 WL 374184, at *3. Relevant evidence includes medical history; signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations. *Id.* at *5. An Appeals Council definition in an unrelated remand order "lies outside of the traditional evidence ALJs are expected to consider in making a disability determination." *See Dieter,* 2026 WL 709730, at *3.

I thus decline to recommend remand on this basis.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: July 8, 2026

_____

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

28